Thank you, counsel. Not to worry. Appreciate it. All right, would you call the case, please? Case No. 13-3785, Alaron Trading Corporation v. Mr. Van Haven. Thank you. Can we have counsel at the podium for both sides so we can just have your introduction? And Mike Barry on behalf of Christopher Hehmeyer. Very well. Thank you very much. Before we get rolling, let me just ask you a quick question, just to be careful. We noted that at some point in time this case was before the Chancellor's Division of the Circuit Court in front of Judge Cohen for confirmation of the arbitration. Was there any time prior to that that the case was in the Chancellor's Division? Was there a motion to go to arbitration or anything like that? Yes. We got a file from the Chancellor's Division in front of us. But that was never filed up until they went in front of us. We met with Alaron Trading Corporation and filed it up. So that's why I'm going to ask you to go to arbitration. And was that, when was that filed? Do you remember the date? June, July. Was it before 2012? Yes. Who was the judge in Chancery that you were first before? Just so that we're not mysterious, I just want to make sure it wasn't me. Normal. Okay, because I was in the Chancery Division. I've appeared before at my gray area at least six times. Okay. So I'm blank right now. Excuse me. Sorry. I actually think this is my right question. We never went in front of the court. We never went anywhere because we resolved a couple of issues that were in the injunction. At the point that the patient had filed, an NFA action had already been filed, and we both agreed to move to the NFA. We never appeared before the court, and I'm virtually certain no order was entered. Very well. All right. Someone's harder than me. Yes. All right. Well, I was in the Chancery Division from 2005 until 2012. And so no one's asking for me to recuse myself. Is that right? Although this is not going to narrow it down a great deal. All right. Well, that's obviously not me. We're not asking you. All right. Thank you very much. Okay. We discussed this beforehand, and we just wanted to make sure. So thank you, and why don't we go ahead and proceed. We'll have 50 minutes each side. Does the appellant want to save some time for rebuttal? Very well. May it please the court. We're here. I think there's two issues before the court. One is whether the causes of action in the complaint were raised in the previous NFA arbitration. And second, if so, is the plaintiff barred from asserting those claims against the individual defendant. And I think we need to look at the fact there are two sets of claims that are in the complaint. One set revolves around December 6, 2008, and the entry into the non-clearing FCM agreement, which was the central document in the NFA arbitration. We talk about a fraudulent or interference with prospective relationships, which were the ongoing negotiations that my client had with Rosenthal, Collins, and PFG Commodities at the same time to go into either a buyout. At the hearing, four claims of my clients were decided. One was whether Penson fraud only induced my client to enter into the agreement, and that was decided favorably for the respondent in the arbitration. Second, whether there was any interference by Penson with those prospective relationships that were ongoing as of December 6, 2008. That was also decided favorably for Penson. The third was whether we, being Alleron or Penson, breached the agreement. The arbitrators obviously found that Alleron had breached the agreement and awarded the $400,000 in liquidated damages. The only count that Alleron of the four that were before the panel prevailed on was the conversion of the approximately $375,000 that was withheld by Penson over the amount of the $400,000 of liquidated damages in the contract. Now, the second set of claims that we have in the complaint began after July 31, 2009. So they are removed in time completely from the non-clearing FCM agreement. The non-clearing FCM agreement was enforced at the time, and after that, Alleron decided to try to sell its business. And as a result of this— I want to interrupt. First of all, Alleron was already in negotiations and was already trying to sell its business. It stopped with the December 6, 2008 non-clearing FCM agreement. Well, did that agreement say that you couldn't enter into any negotiations to sell? No. What was happening is at the time they were in negotiations, this happened. They had to, because of capital requirements and what was said, go into this non-clearing FCM agreement and all negotiations stopped. Later— But wasn't Alleron negotiating or in negotiations prior to entering into that MC? Yes. With not only Penson, but Peregrine and also Rosenthal Capital? Right, and those stopped. And then later, in January, the negotiations picked up again. Okay. So when you say that there weren't any negotiations or removed in time— I'm talking about the negotiations that were ongoing on December 6th and December 5th. The offers were in—Alleron had offers in hand. So those ended. Okay, let me ask you this. Who is Penson at the arbitration? Who is Penson? Penson is Penson VHQ. No, I mean, who is Penson? Who was called upon? Who was the witness that testified on both sides? Well, there was their general— I mean, is that Haymeier Penson? No. No? He can't. All he is is the president of a subsidiary of a public corporation. Who did you call from Penson in your counterclaim, third-party complaint from the arbitration? From Penson. From Penson? Besides Haymeier. Gilmour? Gilmour. The general counsel of Penson? Well, you said Haymeier wasn't really Penson, and Gilmour was the general counsel. Right. So who did you call from Penson? Who did you suggest was really, you know, Penson? We suggested that Gilmour was Penson, or that Gilmour—not that Gilmour was Penson, that Gilmour was acting on behalf of Penson, and that he was the person. But, I mean, Haymeier—this is a public corporation. Mr. Greenberg, when Mr. Greenberg was in negotiations, before entering into this, who was he talking to? Gilmour and Haymeier. And aren't, as far as the 2008, you know, the four claims you described, those are all, in addition, they're all in your lawsuit, civil suit. No. You don't make all the same representations? No. You don't say that Haymeier said all these things? We put in there that he said it, but we have no claim for the $375,000. We have no claim for the fraudulent inducement into the non-clearing FCM agreement. We have no claim for breach of contract. Well, then what was the— What we do have— —you were speaking in damages for in your original counterclaim in Third Crisis? For damages involving those four causes of action, which were the failed negotiations, the offers in hand on December 5th that Alleron could have accepted, and as an alternative to the one at Henson. Those were the four, those were what were being pledged. Here, the only thing being pledged is interference by Haymeier, not acting on behalf of Henson, with those two offers, the ones from PFG, the ones from— Aren't you asking for $4 million in damages in your complaint in the civil suit, just as you were in your counterclaim in Third Crisis? No. No, because they wouldn't let us— For damages. But for different reasons, okay? Let me ask you this. I just want to ask you this. Did you refer to the representations Haymeier made in both your counterclaim and third-party complaints? But in the counterclaims, you referred to them as representations. But in your civil suit, you referred to his representations as fraudulent and or negligent. Correct. Is that correct? Yes. And were those the same representations that he made about that they don't— Yes. That Henson doesn't— Yes. All right. Okay. Let me ask you— The question there goes, though, that what happened is that we learned, as during the course of the arbitration, that Haymeier had no authority to make any of those representations. We did not sue Haymeier in the initial one. All right. Now, how do you claim that in your complaint? The trial judge apparently here disregarded— Constantly said in about five minutes— —that he was acting outside the scope. Now, you have to allege how Henson did not know that he was acting outside the scope. We did. We have to plead that. We did. We pled that the general counsel had given admonitions to Gilmour. It was the general counsel. I thought Gilmour was the general counsel. No. It's a subsidiary. This was controlled by Henson. There's Henson, which is a public corporation, and Henson GHQ, which is a subsidiary. The general counsel in Dallas of Henson— —told Gilmour he could not have a— —told Gilmour he could not have this type of agreement— —with a non-complete and a— —and told Gilmour that they had— —and that they couldn't make— —that that had to be settled before any type of other agreement. So those were in there, and we plead specifically those facts that— —there had been instructions from the parent corporation that these things were not to be done. That he could not promise an override. So that anything he was doing was outside his authority. So did Greenberg get the agreement without those provisions in it? No. Oh, without those provisions? Yes. The subsequent— —there were two— —were there two non-clearings? Well, one was never enforced. That was in September. And that goes to part of the misrepresentation where Haymire, after he was told through Gilmour that you cannot have these provisions in a contract anymore, when the second one was being negotiated, told Greenberg, we're going to give you the same provisions, even though he knew that they weren't there. And then when they had to sign this because their capital, they could no longer accept comments, they were forced to sign this. So they were two completely different provisions. At some point during that— But our main claim here, Your Honor, is the second set of things that happened. There was—and our claim is there is the back end of the purchase agreement with PFP provided for another $2 million if 100—I think it's 135, it might be $125 million in assets transferred. Isn't that in the counterclaim? In our counterclaim? Yes. In this case? No. You're— You mean in the other case? You're the plaintiff in the action.  But you filed a counterclaim. No, I wasn't. It wasn't permitted. There wasn't any discussion in there about the— It was not. Yes, there was, though. And what we have is a list of those things that were not permitted. Yes, and that's what I want to ask you about. So all of the things here are not permitted. They were things that were not permitted by them. I want to direct your attention to that. Now, the arbitration proceedings had a management order, did they not? Yes. All right. And at some point during—you filed your counterclaim, a third-party complaint. And at some point near the time of the arbitration hearings, you filed—or the parties filed some joint statement of issues. What happened is this was initially set to go to hearing in April of that year. Right. At that time, you have to file a joint hearing plan. We filed our joint hearing plan. Yes. Henson objected. The hearing was— Why did they object? They said because the issues that were raised were not in the counterclaim, and therefore only the issues that were in the counterclaim could be brought. All right. What did that person who was like the— The panel that did it, not a person. Okay. I thought someone said to you, if you want to file these additional claims, these issues, if you want these brought to the arbitrators, you must do so immediately. Who did that? A panel or an individual? Individual. All right. So there was an individual. But the panel denied our motion on that. That was in about March? March. They said, this person said do this immediately. Now, when did you do that? Within—well, the hearing— Was it in May? In the middle, within a week or so after that, the hearing was continued because the panel member withdrew. Okay. So we had no hearing. Yes. If we were going to hearing in April, I would need to do it immediately. But what does immediately mean? Immediately means that you can do it if some panel member decides to drop out, you don't have to do it. There's no hearing date at that. So is that your argument? My argument is we did it timely. We brought it, and it could not be decided until a new panel member was empaneled. It's like if a case is without a judge, until a new judge is assigned, nobody can decide anything. All right. So then we did that. Then that panel member withdrew. Then we did it again. I want to ask you a question. That's what you're here for. All right. Okay? I'm going to have questions for them, too. All right. Now, at some point, you were—well, actually, Henson moved to strike when you finally tried to amend. Well, they moved to strike both. They moved to strike, and you wanted to get these additional claims before the arbitrators, true? Correct. Would you agree that these are the claims that are the basis for your suit that you subsequently filed? Correct. All right. So Henson objects to you bringing in these claims. So you agree that they are basically what you wanted to get out of the arbitration. Correct. They moved to strike, and then you were prohibited from bringing the issues before the arbitrators. Correct. Correct. Our position is that you look at the rules of the NFA. This is things that happen six months later. It would be like if I were before a judge, and the judge said, we're not going to let you bring. Those are not compulsory counterclaims. They don't arise out of the same operative facts. Did you believe that those were issues that were already contained in your complaint, or did you believe they were new things that you wanted to bring into the arbitration? They were things that were contained. No, they were not mentioned in the original counterclaim. They were mentioned in my version of the hearing plan, which was rejected. So the answer was no, they were not in the original. I agreed with Henson that no, we had not mentioned those specific things. And why had they not been mentioned originally? Why didn't you bring them into your original counterclaim and third-party complaint? Because we didn't have enough information at the time. Well, had Haymeier been the post? There were no depositions in there. So there were no depositions. Where were you getting your information from? Greenberg? From Greenberg, from ex-employees, from the e-mails. That's why the first time we had an opportunity to get live testimony to find out what happened was when we had Haymeier and Gilmore on the stand, and that's when we found out what had occurred and all of the conversations that had occurred with the general counsel in Dallas. Up to that time, in NFA arbitration, all you can do is get documents. You can't have any type of deposition. Let me break in here for a second and take you back to this question or this statement that you made that it was during the arbitration that you learned that Haymeier had no authority to make the representations that he made. So this was kind of like a turn in the course of the litigation for you, is that right? Correct. How is it that you learned this during the course of the arbitration? Mr. Gilmore, during examination, discussed the— there had been, as Judge McBride stated, an earlier agreement that had been entered into in, I want to say, August or September of 2008 between the two parties, when apparently in September, Gilmore, as we allege in the complaint, went and met with the general counsel for Hunson down in Dallas and described what was in there and about the non-compete provisions, and as he said, he got royally chewed out and was told, those things can never be, it's our policy, they can't be in any agreement. All the negotiations subsequent to that then included, and they were going back and forth with that provision in there, and as we allege and as my client testified, Haymeier said, fine, it's not going to be a problem. The first time it didn't appear was that they kept saying, let's get these things done. Didn't Haymeier, didn't you allege in your original counterpoint that after the two, the non-compete, and what was the other provision that the general counsel said, we are not going to have these in any non-conformal, I'm just using this, didn't Haymeier tell Mr. Greenberg and didn't he promise Mr. Greenberg that they would operate under the same premise or provisions that they had in the earlier agreement? Yes. So can you, can't you say from that that Mr. Greenberg knew that these representations that had been made were made earlier, he was aware of that? He wasn't told that the general counsel had said you can't do these things. Haymeier is telling him, trust me, it's not fair. Let's go back to my question, and I'd like you to finish your answer with regard to that. What I'm concerned with is how was it during the arbitration that this came to light to you that there was this, I guess, rogue aspect to it? A long narrative answer by Mr. Gilmour as to why there was, why this provision was not in the contract. And he then proceeded to talk about this meeting, which was never memorialized in any document, about the conversation with the general counsel. Between the general counsel and Haymeier? Oh, the parent and him. And Haymeier? No, and Gilmour. Okay. And then Gilmour goes back and tells Haymeier. Haymeier, okay. So to talk about, to get into the legal discussion of privity, how should we approach this question of whether Haymeier was, you know, he was an agent, obviously, but was he? I don't think anybody that is the president of a subsidiary of a publicly held corporation could possibly be considered as one in the same of that. I said I don't think that anyone, I don't care what their position is, of a president of a subsidiary of a public corporation can be considered to be the same as that entity, which reports its earnings publicly, which reports it as part of the pension, who, as we pled, had to take orders from the general counsel of the parent corporation. So he is not, you know, if he was there and it was a wholly owned with no partners, and he owned it and he ran it, yes, he's the same person. But that is not who he is. All he is is the president of a subsidiary of a public corporation that has an employment contract. That's it. Is he doing the negotiating for this deal? Sure. So then isn't he like the face of the? He can be the face, but then the question comes, as it is in Atheron, what is the scope of this authority? And that's a fact question that's not permissible on a motion to dismiss, and which in Atheron wasn't even permissible on a motion for some re-judgment. Well, it's Atherton, but the facts are a little different, aren't they? You had an insurance administrative quality care health plan made in Illinois, who was initially the one that denied the claims of the family that was trying to get medical treatment for their child. And then in the subsequent suit, the individual doctors or doctors and nurses, they didn't work for Q-Chip, did they? No. I don't know. I don't think so. No. So, I mean, you have people that aren't employed by a subsidiary of. But how can I, as a subsidiary, be the face of something that's owned by a public corporation? I can't be. Well, that's my question. Now, you keep on referring to Hamire as the president. Wasn't he the CEO? Or the CEO of the subsidiary. Right. And why in the negotiations, if you knew you were dealing with the subsidiary, why was Al-Aman dealing with the subsidiary? Why didn't you just deal with the parent corporation? Because that's who we were told to deal with, to deal with him on these. And they were friends, supposedly. Who told Al-Aman to deal with Hamire? Who told him? I have no idea. I assume Hamire and Gilmore. Well, who did Mr. Greenberg deal with other than Gilmore and Hamire? Anybody else? Well, yes. In the initial, when they were initially in January or February of 2008, when Penson was thinking of purchasing outright Al-Aman, he dealt with a number of people out of the Texas home office, the Dallas home office. But this was not, so as far as the purchases, he dealt with the idea that they were going to buy the company. He dealt with the home office. This is a clearing. I mean, you wouldn't deal with the home office on a clearing relationship. If I'm a member of the Board of Trade and I want to clear through PACs, I don't have to go to the head of Merrill Lynch. You just go to the person at the Board of Trade who's in charge of whatever the clearing is, and you negotiate with them. The question is, what is the extent of that agent's authority? And that's a fact question here. You've argued not only is privity lacking, you've also argued that this subsequent suit did not arise out of the same transaction or single group of operative facts. Right, because before the panel was only what happened in December of 2009. They did not, and they said we're not going to consider, and the issues were the other four causes of action that all arose in 2009, as late as June, but beginning in January with TD Ameritrade and then continuing into March and into June. Well, tell me, segregate them. That's what I was trying to do. The damages that you were seeking in the counterclaim and third-party complaint from how you were damaged in the- The damages that we were seeking in the counterclaim was that at the time, Alleron was beset by everybody's bills, and they needed to pay people, and they needed to fund operations, and our position was that, you know, this is a liquidated damage agreement in the contract. It says you can hold $400,000. They withheld $375,000 additional, which as a result, we had to close operations. So we were suing for that, for damages, not only the $375,000, but that they did it purposely to force us to give up our rights to pursue that money and to pursue any other claims. Where did the $4 million come in? What is the $4 million you were seeking? No, the $4 million we were seeking was the loss of business that- Had been interfered with? Partially, and partially was we had to close down operations because we no longer had operating capital because of this $375,000 that was withheld from us. Do you believe- And obviously the attorney sees we had to spend, go, and try to get that money back. Do you believe that the broad arbitration clause contained in the agreement would include what you subsequently sought in your civil suit? Did it arise out of- No. I think that it's a separate counterclaim of things that were unrelated to the contract. For example, inducing the Miami Branch office to violate their employment agreements to try to get, after the asset sale, to get introducing brokers not to transfer their accounts to the DFCM PFG. None of those had anything to do with the non-clearance agreement. Those are just separate. And that's the reason- The issue I'm going to do is whether those arose out of- No. And the panel, you know, we have it here. They only considered four issues. We went in- And yet you tried to bring them in- And they said no. Late. Not late, Your Honor. We brought them in and I'll concede to you, we tried to bring them in late in March, but in May there was no hearing and they said no. In July there was no hearing and they said no, and all the discovery had been done. And then we didn't have the hearing. No. They're arbitrators. We don't know why. But they didn't have- There's no compulsory counterclaims. No. I understand. So there's no- So we're told no. We're told no for a year. We believe there's an easy explanation. Guess who's the executive director of the arbitration association that we're in front of? Hey, Mike. Yeah. So we have a real reason why we- And there's nothing that's alleged in your counterclaim. Right. You use that fact. Right. All right. Let me break in. Let me ask you something. So at the arbitration, you were only successful with regard to the- 375. The 375, and you were unsuccessful at the other claims. Is that right? Yeah. They held we weren't fraudulently induced. Okay. Let me ask you this. So what was their defense in the arbitration? That they didn't do it. That there was no fraudulent misrepresentation. No fraudulent misrepresentation that they were entitled to do. Remember, all of these other things aren't in front of them. The taking of the Miami branch office TD Ameritrade interference with the IDs isn't there. They said they fully disclosed everything and that they weren't at fault. And that we breached it. We read the agreement different than they did, and that was one of the issues, is whether they breached the agreement or we breached the agreement. If we didn't breach it, we wouldn't have owned the $400,000. So I'm assuming, obviously, the panel found out we breached it because they awarded them the $400,000 in liquidated damage. What position did they take in the arbitration with regard to these statements by Hamer? We don't know. Or did they take a position during the hearing? There's nothing that's there. Now, one of two things, and to me, if they did not find that he, or believe he was acting within the scope of his defense. I'm sorry. Maybe I didn't phrase the question well. I'm not asking what the arbitrators found. I'm asking, in the defense of the arbitration, what step did they take with regard to these statements by Hamer, if we could tell? Or did they pick? What I'm trying to find out is, did they walk away from Hamer during the arbitration? No. They stayed together? Yes. Okay. They said either he didn't say it, or we misinterpreted it wrong, or we shouldn't have relied on it, or it didn't mean what we thought it meant. Now, they were very vociferous in there. And we walked into the arbitration, as I say in there, and as we say in our claim. We never said, you know, we don't know his position. We thought he was our friend and was being honest with us. The first time is when he testified and Gilmour testified. If we were in court, there would have been a completely different case. The counterclaim suggests that if he had been honest. I don't know how you can say now you thought he was honest when you said in the counterclaim, had he been honest? Right. We don't know, as we say in the counterclaim. We didn't know if he was being honest. In the counterclaim, you also say that we preserve our right to name him individually. Right. If we find that he's untoward. Right. And we found out two days before the hearing ended. So, Mike, what I was leading to is what I just want to ask you finally is, if in the defense of the arbitration, Haymire and the corporation kind of stayed aligned, if they didn't walk away from Haymire, does that lead to the conclusion that their interests are the same and, therefore, that he's imprivy with them? No, because he has to be imprivy. If they would have said, we authorized him to make these statements, then perhaps they would be imprivy. They said he made these statements. And that would only take care of two of the claims, by the way, because the stuff later has nothing to do with anything. But if they would have said, yes, he made these statements, yes, he committed, he did this, yes. But their position was he never made these statements to us. We knew. We always knew that these provisions were not going to be in the contract. We were told what was going to be. Nobody misled us. What did Haymire say about that? Same thing. So, Haymire said, I never said these things. And the corporation says he never said these things. Why aren't their interests the same? I mean, why aren't their interests adequately presented together in the arbitration for the question of privy? His interest was never at issue because we never said that he was separate. I mean, I think the whole point of that is that if somebody goes and acts outside the scope of their authority, then they're no longer imprivy. And from what we learned at the arbitration, he was acting completely outside the scope of his authority, that he could not make any of these representations and that there had been specific instructions from the general counsel of the parent corporation that this is how this has to go and that's the way it's going to go. And then there are different representations made to us. Did you say earlier today that the suit you brought involved claims arising after July 2009? Did I hear you correctly? I don't know if it's July or June. But it brings up things that happened with the failure to interfering with our relationships with the IDs who then did not transfer to our new clearing FCM. In your summary of your first complaint filed in the circuit court, you state in paragraph six, when you summarize the clauses of action, you say that you're seeking damage, $4 million, from Haymeier for his misrepresentation. From Haymeier. It says Alaron Trading versus Christopher Haymeier. I'm looking at the complaint. Okay. The common law three for the, and it says that. The current one. Yes. The current one. Okay. I think maybe you filed an amended complaint. Did you? I don't think so. All right. So here we go. The complaint says on page two that you're seeking damages for $4 million from Haymeier for his misrepresentation, fraudulent omissions, and other wrongful acts that he committed during the period of what appears to be August 2008 through June 5, 2009. Right. Okay. So now I don't understand. I'm at a loss. This is your complaint where you're saying all these acts that he committed during this other timeframe are what you're seeking recourse for. No. It's not what I said, Your Honor. I said that there are two sets of acts. Yes. The first sets of acts are those that happened prior to December 6, 2008, and that of those, the question becomes one of privity. Was he in privity? You know, was he authorized? What's the scope of his employment? The stuff after that was never before the panel. All right. So those have nothing to do with whether or not they're in privity or not. We could have filed a second claim against PENSA, but we weren't going to do that. The trustee wasn't going to waste more money going back in front of Haymire's organization. So what filed? So the question I have is you keep referring to that he was acting outside of his authority. Right. And you indicated earlier that in this type of situation, so you're dealing with a clearing, you don't have to go to the top of the corporation. Correct. And we do know that Haymire is the CEO of GHCO. Right. So when you say that he's acting outside of his authority, is he acting outside of his authority as the CEO of a subsidiary, or is he acting outside of his authority as the negotiator? I'm not clear. You keep saying that he's acting outside of his authority. How is he acting outside of his authority? Because he's been told by the parent that the subsidiary cannot enter into contracts that have these provisions which he was representing he would put in this contract. So he was told that in September, yet they were, you know. So is he acting outside of his authority as an agent for the parent corporation? The parent corporation, I don't see a distinction. The parent corporation controls the subsidiary. They're telling him what. What I'm just trying to get clear is when you say that he's acting outside of his authority, in what capacity is he acting outside of his authority? He is acting as CEO of Tencent. He is acting outside of the authority given to him by the parent corporation to negotiate contracts with the subsidiary. But you knew you were dealing with the CEO of a subsidiary. Correct. Okay. You did not oppose the confirmation of the arbitration award. No. And why was that? Because it was clear that, A, they first had not, that they had denied the four claims. Well, we had prevailed on one and lost on the three claims they were hearing. So there was no reason for it. There's very limited means by which you can fight the confirmation. Anyway, it's got to be outside the jurisdiction of the arbitration. I would have fought it if there had been a bar on bringing a second arbitration. In other words, if my claims had all come out of the same time period, I would have. But that's discretionary on them whether they're going to let the second group in. I could refile. So that's fine. But, yeah, on the claims against Tencent, did we lose three of them? We lost three of them and we won one. Well, let me ask you this. If the defense in the arbitration was, you know, these misrepresentations were not made and they were successful in that defense, why do you get the claim? We don't know if they're successful. Well, they won, right? That doesn't mean. The panel could have simply found as well that he was acting outside the scope of his authority and said, you know, we're not going to hold Tencent liable for what Haymeier did. Haymeier is not a party. So we don't know. I mean, there isn't a decision. There aren't instructions to a jury or special verdicts. So if they've not. No, but you are taking damages based on misrepresentations. Were you not in the original counterclaim? Right, but only the misrepresentations that they allowed us to present. I can't see things that are not before them. Well, is that the only one we're talking about? No, no. First of all, the representations that are the subject of your counterclaim are that Haymeier always represented that they, that Tencent would never steal any of the customers that Allen had developed over 20 years. Isn't that one of the misrepresentations? For inducing us to get into the contract. But that has nothing to do with TD Ameritrade. It has nothing to do with interfering with our subsequent asset purchase with PFG. It has nothing to do with inducing. But in your counterclaim, you do allege that the actions of Tencent interfered with your ability to sell Aileron at the price that you were looking for. No, we sold Aileron, always sold Aileron at the price we were looking for. The price in the contract is the price. The things that are not, have anything to do with, there's not a word in any document at the, in the pleading about them being able to steal our Miami office and him inducing our employees to breach their non-competed remit. That is separate. Number two, it is... But that doesn't mean you get some raisins at some other time. Why not? It's a separate... Well, if you, you try to raise it at the arbitration. Right. But if I go before a judge in this, in this state, and the judge says, look, I've got a contract in front of me. I'm not going to let you bring in these things that happen six months from now. That's some other time. So... Well, we don't know if they decided that or if they decided to wait that long or what. Okay. You know what? Grace Judicata is an ethical doctor. Here's the real softball to you. Then why didn't they let me do it? When the arbitrators did not allow you to pursue these other claims, even if Haymeier establishes that you have, that they've met the elements for race judicata, the courts do not have to apply the statute. And if it would be unjust and unfair to do so, in its essence, it's an equitable statute. Okay. So then I'd ask you, is it really equitable? No, but there's no hearing. Why not let me amend? Oh, there's no additional discovery. There's no additional witnesses. Even if these things are six months ago, let's all hear it at the same time. They said no in May. They said no in July. They constantly said no. Why? What is equitable about that? We're going to ask the closing counsel. Okay. I mean, we're just looking at it. Those things that we're talking about, the four claims that happened in 2009, have nothing at all to do with the other claims that revolve around the things said in 2008. TD Ameritrade happened later. The interference by telling IDs not to transfer to PFG happened later. The solicitation of our employees to violate their employment agreements happened in June when we can prove the exact date. So those things were never part of it. Okay. But one thing I do want to correct you on, you just said that the counterclaim and the third-party complaint doesn't refer to, mention, or in any way discuss the Miami situation. Our counterclaim? Tetson steals Al-Iran's remaining business. Paragraph 30 of page 35. Is that the counterclaim that was, of which are we talking about, what was filed in front of the arbitration? Yes. The initial one or the one that was not permitted? The initial one. I'm not looking at the one that was permitted.  The one that was permitted says while Al-Iran was attempting to put out fires. And they said we couldn't. The Miami situation is here. What's your answer then? The question is, I argued the very same thing to the panel and said, why can't we bring this issue in? And they said you can't. Okay, I could be wrong, but this says the Miami branch office comprised Al-Iran's entire presence in Latin America. The customers and FIVs that the office introduced directly to Al-Iran at Tetson's instigation, Al-Iran's employee in the Miami branch office, stomped it with all of the Al-Iran customers and FIVs as well as all the customer files. And then you seek damages as a result of that. So my question is, and they said, no, they said we couldn't. You weren't allowed to pursue that claim. That's the point. Wait a minute. Your original counterclaim went forward. No. There were several things that were stricken. There were a lot of issues that were stricken, and the issues regarding that and the claims regarding that were stricken by the panel. From this counterclaim? Yes. They didn't let you go forward on all your allegations that you had originally presented in this counterclaim? This was before the arbitrators. No, Your Honor. I hate your... They struck this later. I'm saying that if you look at the issues that the... Look at page 19 of our initial brief. Issues... Those are the issues that the panel ordered stricken from that were not before them from the joint hearing plan. Regardless of whether they were already in your counterclaim? Yes, ma'am. Okay. And it's what paragraph? Page 19. I list all 11. We start with the four causes of action that were stricken, fraudulent misrepresentation. The opening brief, page 19. 19? 19. If you look at the first page, all of our fraudulent interference with prospective business relationships were stricken, suggesting that all of these issues, which are the... I was looking at page 19 of your complaint. I apologize. I was looking at another page 19. All right. So every one of these, the panel said, and I don't care if it's in my original one or not, based on Penson's objections, all of these were stricken from the hearing plan. Where's the one about Miami? Number two. Number two. Whether Penson fraudulently... Okay. All right. And then, you know, fraudulent abuse, and then number five, which is exactly the thing we're talking about here, whether we were fraudulently... They said you can't bring up that 2006, whether we were fraudulently... Number six. You can't bring up whether you were fraudulently abused not to enter. So all of those things were never before the panel. Thank you. Okay. We've asked you a lot of questions. Yes, we did. And so we've taken up a lot of your time. Would you like to summarize anything or have anything further? You know, I would just summarize it by saying the only things we are alleging in this lawsuit are those things arising from the issues that are stated on page 19 of our brief that the panel said we could not raise, regardless if they were in our pleading or not. They decided. Now, I'm going to admit, because I want to be, you know, as honest as I can be about this, that the stuff about 2005, if there's privy or privy, raises an issue, you know, because it is part of the operative facts. You plead something, and then somebody says you can't prove it. Has that really been decided? If I plead, A, fraud will induce me to something, and it's in a pleading, but a panel says or a judge says, well, I'm not going to hear any evidence on that. Has that really been decided? And the answer is no. Second of all, if you take his position, and Atheron, and I'm sorry I mispronounced it, it's a factual issue, and we have said and we have pled he's outside. So that's basically our case. And it's page 19, I think, of our brief is pretty much our case on the issue. Thank you, counsel. Thank you. Thank you. May I please record? I'm not entirely sure where to start. Well, let's start with the equitable facts of the race judicata. Yes, ma'am. One of the precepts that we find in the cases is even if you establish that the elements of race judicata have been shown, that it's an equitable document, and the court does not have to apply it, if to do so would be unjust, unfair, inequitable, and it's basically an equitable document. So, Mr. Iberoni has pointed out that they attempted to present certain issues to the arbitrators and Henson vehemently opposed these items described on page 19. And one of them specifically is related to the Miami situation and the fraud or theft of their business. Now, how can you say that we should apply this when Henson took the position that this isn't the time or the place for any of these issues to be decided? There's a few errors in the basis, the assumptions for that. First of all, what actually happened with respect to these additional issues is that there is a joint hearing point. And one of the points about this case that I think Judge Blodgett has done an excellent job on is sifting his way through the distinctions between what happens in an arbitration and what you would have had it been a court case. For example, there's no pre-hearing statement. There isn't even a complaint that has numbered paragraphs and an answer to each part, et cetera. And there's no findings of fact and conclusions of law at the end. Having said that, what happened here is that through discovery, and there weren't depositions, but there was discovery, Henson, and I know this is a side issue to your question, there's only one Henson in this case. Henson G. H. Coe is a company that was the defendant in the present complaint, not a defendant, the respondent in the NFA arbitration. The parent was never involved. Whether there's a parent or not a parent has nothing to do with res judicata. There was an action brought between Alaron and Henson. Henson is only Henson G. H. Coe. And Haymeier worked for Henson. Sorry, he's the president and CEO of Henson. So Henson is Haymeier. Henson is Haymeier, answers these questions. And I'm sorry I'm getting a field from your Honor, but I think it's important to clear that up as we move along. Because when I say that Henson did certain things, it's only Henson G. H. Coe, only acting through Mr. Haymeier or on occasion Mr. Gilmour's general counsel in certain situations that came about during the course of the negotiations. So what happened was that Henson became aware that Alaron was going to have some series of damages which had not been presented earlier in any of the writings. Primarily this $2 million that they said they were entitled to by PFG as a result of their agreement with PFG, that they were going to claim that Henson had judgment from receiving. We brought a motion to eliminate. Henson brought a motion to eliminate to keep from getting into that because we said it was outside of any of the things that had been put before the tribunal. The tribunal wrote back through one of his staff members and said, until we get to a hearing plan, we don't know what he's going to say, what they're going to say. If there's a hearing plan that has in it arguments or positions that are not in the earlier documents, then we will not accept it. We will say, you're talking about things that are not here, and you need to amend your pleadings to meet up with the arguments you've got. Because the joint hearing plan is the arguments. There's Alleron's version of the case, 35 pages of telling the story before the panel, a year after, sorry, two years after, in this case, the original documents were filed. The joint hearing plan has your version of the case. That's what you rely on. That's what you're telling them. If that has in it things that are not supported earlier, we won't accept it. That was the document from the staff that said to Mr. Iberoni, if you want to amend your complaint, you should do it now. If you plan to bring things in the joint hearing plan that are not already in before the court, then you should do so now. So did Henson and Alleron come up with the joint hearing plan? Yes, ma'am, although they write parts of it themselves. Parts of it, you know, documents that are British and Australian. So one discrete part of the counterclaim versus what the arbitrators struck from the joint hearing plan. Okay? One of those is specifically whether Henson fraudulently induced Alleron to encourage its Miami branch office to become a branch office or IB of Henson, whether Henson fraudulently induced Alleron not to enter into a referral agreement with another FCM relating to FIB Gene Latham's business. Now, Alleron's counterclaim and third-party complaint specifically refers to this Miami office and this theft of business, which I was earlier with. How could that not be part of the joint hearing plan when they alleged it in their counterclaim and third-party complaint? It was. Then why did the- I don't know. I don't know. Maybe because it was unnecessary. Maybe because it was late. If you opposed it, didn't you oppose certain things? What they quote from is our opposition to them being able to argue things that were not in front of the panel. The panel said you can move to amend, and he didn't move to amend until, as Your Honor earlier pointed out, two months later. Why do you have to amend anything about the Miami office when it's already in the counterclaim? That's a good point. I don't know why. I don't know why you wanted to. Maybe they felt it was already in the case. It was that you moved to eliminate it to keep out certain things. Not Miami. The time and why- They strike it from the joint hearing plan. At the time we moved to eliminate, there was no hearing plan. There was no motion to amend. We did not- What he quotes, we said we don't think he should be able to talk about these issues that we're concerned he's going to talk about. They said if it's not in the counterclaim, then he can't raise it in the hearing plan. Only when he filed the hearing plan did we say we don't know what these things are. Okay. Let me ask you this. You know, the doctrine of res judicata says that there are two things that were or could have been decided, if they arise out of the same operative case. So how could these things have been decided? They were. They were decided? Absolutely. Absolutely. They were addressed- So these things- The only way- I'm sorry. The order of the arbitrators struck Aileron issues 1, 2, 3, 4, 5, 6, 7, 11, 13, and 18. So how could any of these have been decided? They were presented by Aileron at the hearing. That's why we have 300 pages of transcript that we gave to Judge Dayle. Because they came in and said, at the pleading stage, we have this order. We don't want you to look any further. They clearly were not part of the case. That is dead wrong. We really only need to read their Aileron version of the case. Aileron's version of the case, which has been submitted, and I'll just take one example of why the case law, I think, is very on point. If you look at the acts and transactions, don't look at one pleading in the abstract without knowing what actually happened. A late effort to amend a complaint, and they say, this is redundant. It's already in there. So it's denied. But they may not say why it's denied. Just say it's denied. But the case, what was before the panel, what was actually in the case, what are the acts or transactions involved in? I'll just take this one example. Back at page 19 of Aileron's brief, issue 18, whether pension is liable for at least $600,000 in lost net profits. At page 33 of the jury hearing plan, under Aileron's version of its case. Where would we see that? Well, that's a good point. Mine don't have the numbers. I'm sorry. That's all right. We'll tell you. Go ahead. Go ahead with your point. It's in my declaration. But I don't know what number it has in your court record. I'm sorry. This is Aileron's version of the case in the jury hearing plan, which tells the panel what Aileron's case is. Page 33, it says, Aileron is also entitled to at least $600,000 for its share of the lost profits in the PFG purchase that would have accrued if Benson had paid the trailers as represented. This was presented to the panel after the ruling your Honor is talking about. All right. In the paragraph above it. So, really, that issue was decided? Absolutely. Against? Well, it was presented to the court. It was presented. No, it's not. Sorry. To the arbitration panel. Pardon me. It was presented to the panel. As you see in the panel's decision, it talks about the various points where people depend and so on. It does not, however, say we rule this way on Miami, we rule this way on the Russian lake. But even that theory, that last theory about $2 million, in the paragraph before the one I just read, at page 33 of the jury hearing plan, Alaron said over $70 million in Alaron's customer assets remained at Penson. Added to the approximately $7 million in customer assets that transferred to PFG, Alaron would have received the $2 million back-end cash payment from PFG had Benson paid, I think it says said, but I think it means paid the trailer as promised. And the trailer is mentioned in 13. The one that was supposedly not allowed to be. Excuse me. It's the trailer that's constantly referred to throughout the arbitration and throughout the complaint that allegedly Mr. Haymire said that Penson would pay. The trailer means a lower commission even though the business isn't there anymore. And that's the whole concept of all these acts and transactions. It's very simple. I mean, it is in the financial world. Mr. Perry, let me interrupt once again. Wouldn't you agree that the question of whether Penson intentionally interfered with Alaron's contractual relationship with PFG was clearly something that was thrown at the arbitrators? Yes. So that's another one. That's a left. Well, even if you look at what it says they had, the original complaint, some of this is different. And that's the reason you have a joint hearing plan and your version of the case. Because between the time they filed and the time that we tried the arbitration, there was more information, no question about it. And that's why they put it into their version of the case. They had a version of the case that they were going to present, but they were still looking for these. And they told the judge, sorry, the arbitrators, what their damages were going to be. They didn't necessarily know these damages at the time of the counterclaim. And they did not strike anything from Alaron's version of the case. If you want to know what was tried before the arbitrators, you read Alaron's version of the case and you can read the excerpts from the case itself. At the end of that case, Mr. Ivoroni on behalf of Alaron argued that they had established certain things. That's what was tried in that case. But the actual transactions that it's about are an agreement signed December 6th. Basically, that's what it is. Because everything after that has to do with what the effect of that agreement is. In other words, we transfer the accounts onto your books. What if we ask you to transfer them out? What are you going to do? Well, we'll do what we have to do under the agreement. What if you don't do it? What happens then? What if you do it to interfere with that? And all of their damages and everything go back to the statements they claimed Mr. Amire, Henson made, during negotiations to enter into an agreement. And what about this subsequent allegation that Alaron's argument they became aware of later? That being that Amire knew full well that the agreement wasn't going to have the non-defeat, solicitation, because he had already heard from Gilmore that the Dallas office was furious that they had included it in the earlier agreement. Actually, what it was is they set up, when you transfer accounts from one clearing firm to another, you can do it on what's called an omnibus basis, where if I have 50 accounts that add up to $100, you list me as the customer for the $100, and you don't know who my accounts are. That's omnibus. They did that in August. They were discussing what's called a fully disclosed, that's part of the NCFCM, and claiming, let's just put them on your books, and then you'll know who they are. And they signed one of those, but it never happened. They decided we don't have to do that. That was a preventive measure because it would be based on Alaron's capital situation. So that agreement was signed. Those allegations that Mr. Hamire knew this and yet said something to the contrary, in some respects proved too much, because they're going to say he acted outside the scope of his authority. Nobody's claiming that that agreement he signed in August wasn't enforceable. In fact, they claimed it was enforceable. Why? Because he signed it as president. If he's the president of the company and he signed an agreement binding that company, then what authority is it we're talking about that he's acting outside of? Because, and the next point, when they came in on December 5th on a Friday afternoon and said we've got a problem, we need to have all these accounts transferred because we can't hold customer money anymore, they took out the old agreement that was never effectuated, it was signed and never effectuated, and Carl Gilmore marked it up, taking out the provisions he knew couldn't be in there, and sent it over to Mr. Greenberg. I have a question in regards to the issue of the authority. Counselor underpins that GHCO was just a subsidiary, therefore he didn't really have the authority that he was representing he had in the negotiations. It was the General Counsel that was really running the show here. Well, it was Mr. Hamire, the negotiator, and Mr. Greenberg. It's what comes out in the transcript in the meetings. That's what the story that's told you. And frankly, the best summary of all of this is the Appendix A to our, Christopher Hamire's reply in support of his motion, where there's a comparison of what was said in the joint hearing, etc. But on that issue, it's Mr. Greenberg talks to Mr. Hamire. Mr. Greenberg is Allenron. Allenron has shareholders. They're not all Mr. Greenberg. Penson has shareholders. It's called Penson Worldwide. Can they exercise some influence over their wholly owned subsidiary? Yes, happens all the time. It doesn't mean you can pierce a corporate veil to that. But does Mr. Hamire have the authority to bind the company, Penson GH Co.? The respondent in the NFA application? Absolutely, 100%. Mr. Greenberg wouldn't be talking to him about this otherwise. Mr. Hamire wouldn't be able to sign these agreements. But the very theory that they come to establishes, in our view, privity under the case law here, which is the ability to adequately represent the interests. The interests of the company in these cases are that negotiations get put into writing and signed. And that's what happened. That's what was presented to the arbitration panel. You don't have to go any further than the complaint. Oral representations. That he didn't have the authority to make oral representations. That shouldn't be a huge surprise. Very few presidents of corporations want the corporation to be bound by oral representations. That's why those are called negotiations. And they get written into agreements. And that's what the arbitration panel had. And it was a written agreement. That's the act of transaction under the River Park cases. That's the act of transaction that the arbitration was about. And that's the act of transaction that the complaint is about. Were there statements made in connection with the negotiation of that agreement pre-December 5th that somehow should be enforced against the company? And if not, were there other representations made with respect to other negotiations? Because, for one thing, I mean, just another factual issue. Judge McBride said, did negotiations to sell the company continue after December 5th? And they did. And then the transcript of the record shows that. Because the issue of what happened with PFG when the counsel says they sold it, they actually transferred everything and got paid everything up front. It's not a commission situation. When they transferred them to Pinson, Pinson would clear the trades and pay an ongoing commission. If you want to get out of business, you transfer all of the accounts to somebody, they're all theirs, and you write a check. Those were the negotiations that continued during this time. But there were between Alaron and, obviously, PFG and other companies and with Pinson. And with respect to PFG, the issue was when we asked you to transfer those accounts, what's going to happen? And the story told at the hearing and the issue in the complaint that is the same is that Pinson did not do what Alaron expected them to do based on all representations of Mr. Hamar. You can read parts of the transcript that are in this record, and it's fairly extensive. You can see that it was Mr. Hamar who said to Mr. Greenberg, if you want some kind of agreement for what will happen after the accounts are transferred to PFG, we'd better write that up. And he got no response, no writing. Why? Because he thought all of the accounts would transfer and he'd get paid over there. He didn't think people would not transfer and would stay with Pinson, and he was wrong, but he wanted to play it both ways. After he did not have any agreement, he claimed that he was entitled to get this based on oral representations made before the agreement was signed. He tried to bring a claim against Pinson GH Co. because Mr. Hamar said, we won't fish behind the net before the agreement was signed. If he didn't want to sign a contract that didn't have an uncompetent non-solicitation, he had every opportunity to. And when he signed, he signed on behalf of Alaron. Mr. Hamar signed on behalf of Pinson. Let me ask you the same question that I asked Mr. Ravarone with regard to the issue of privity. One of the things, well, I think our focus has to be how are the interests aligned or not aligned at the previous hearing, at the arbitration hearing? So what I asked Mr. Ravarone was, well, what was the defense at the arbitration hearing? And the answer I got was, well, the defense at the arbitration hearing was that these representations were not made. Not that they were made and that they were made outside, that he was a rogue agent. The defense was, you didn't understand the deal, and these representations were not made. So if that's the defense at the arbitration hearing, aren't their interests aligned? And if their interests are aligned, then aren't they in privity? Yes, Your Honor, I'm happy to agree with you. This is Chicago, and that was a 16-inch softball. But I'd like you to speak to it, because I think that's an important issue. And that obviously is our view. To say what was the defense is a series of questions, but at no point were the interests not aligned. Mr. Haymire explained exactly what he said to Mr. Greenberg. If Mr. Greenberg took that as somehow an agreement, a promise, Mr. Haymire said, I said it and I meant it. That's the way we do business. We don't steal our customers. And we didn't, he said. We don't and we didn't. He doesn't deny he said we don't fish behind the net. He doesn't deny that he said we don't steal our customers. Was that a way of saying we don't steal? Well, it's a question, it's a complicated issue to say, because you don't steal customers. They aren't our customers. They're independent. So what they mean by that is that if you ask us to transfer them, we're going to transfer them. Yes, but that individual company or person has the right to decide whether they want to be transferred or not. Many of them decided they were going to stay with Henson as opposed to being transferred. That's correct. And Alleron said that they had exercised some undue influence in that. That's the tortious interference. That was actually in the counterclaim. It's well, it's like, or maybe in the original counterclaim, tortious interference, with the IIBs, the IBs, and others. It's throughout Alleron's version of his case. That includes Mr. Latham, the Russian broker. That includes the Miami office, because at the end of the day, Henson got some of that business back. So that includes all of that. And so, but in every instance, Henson and Mr. Haymire were one and the same. He said, Henson does not do that. And we didn't. He said, here's what I told him with respect to the trailing commissions for business that stayed with Henson. I said, what are we going to do about that? And there's emails in the record. What are we going to do about that? And Mr. Haymire, did he ever get back to you? No, he did not. Did you promise to pay him X percent of what? No. I told him we needed to work that out. And those percentages were subject to discussion. Did you ever work it out? Did it ever come to an agreement between Henson and Alleron? No, it did not. That's Henson's defense, and that's Mr. Haymire speaking 100% on behalf of Henson throughout the entire proceeding as to every issue raised. What they did with respect to Miami, what they did with respect to Mr. Lakin, what he did in his discussions beforehand, before they signed the agreement, what he did when he found out that they needed a new agreement on Friday, December 5th at 4 o'clock, that he told Carl, you've got to mark that thing up. Mr. Berry, the counterclaim was against Henson and Gilmore. Who is Henson? I mean, this is, again, another stockpile, but who else is Henson in this original? I mean, they would have had other officers. The only people that testified at the hearing for Henson, Mr. Averone was correct, were Mr. Haymire and Mr. Gilmore. Mr. Haymire was on the stand for a long time. The theory of trial was, in fact, different than the theory of the original counterclaim. The theory of the original counterclaim was that Mr. Gilmore had cooked up a scheme. The theory of trial, as developed and presented in their version of the case that's in here, and as developed before the court was that Mr. Haymire had made these promises on behalf of Henson and that, therefore, Henson owed Alaron money because Henson did not honor those promises, although there were other promises. Now, as I said, Mr. Haymire said, I didn't say exactly what he said. I did say we need to talk about some of these things. I did say we should enter into some groups, but we as Mr. Haymire and Mr. Greenberg, we as Alaron and Pencil. Now, let me try to come full circle on your question of equity. Here's the problem. I think the cases do it right, and I think your point, Your Honor, is very good about equity, and I think that's why the cases get to where they get, that you don't look at any particular pleading. You don't look at the cause of action that was actually brought. Was it called contract? Was it called negligence? What was it called? Because you have to take a totality of circumstances, so they moved even from a same evidence test to a transaction test, which gets you to the core and does not necessarily put anybody's spin, for want of a better word, perhaps perspective or leaning on it. It doesn't isolate any one thing, like a pre-trial pleading where you don't really know what happened. What were the acts of transactions? That's point one on the issue of same identity of cause of action. On the issue of privity. I said I'm going to get to it. Sorry. All right. No, I'm going to ask the question right now. Privity is something we've talked about, but your position, I just want to clarify this, your position is that these allegations were decided. This isn't something that could have been decided. These were actually decided. You know, I'm not going to go through the 11 and make sure that all of them, because some of it is like promissory estoppel different than detrimental reliance. I think that's why you use identity of cause. I mean, on the first prompt, I don't think that we're piercing you to find out if we think that the allegations arose out of the same set of facts. And we started down here, and you said, what about Miami? I said, absolutely. Well, I thought Miami was in the counterclaim. Miami was, it's in there. And you're saying that in their hearing plan, that was one of the things that they clearly wanted to address, and it wasn't. Yes, and my view is that we went down those things. What we presented to Judge Taylor was exactly that. You can find the issues. And here, this is just, it's the implicated claim. Mr. Hamer's alleged promise regarding trailing commissions, large Russian client staying at Benson, Miami branch office becoming IBM Benson, penchants and interference with others. And then we have the joint hearing plan excerpt that we say shows that those issues were in fact. Now, we don't take all 11, because I just need to say it quick. It's not about all 11 issues. It's about what the complaint says. And the complaint has those four points. I don't, whether there isn't a claim in here from promissory estoppel or some of the other claims. So you start with the complaint, so what's the complaint about? It is our view, Your Honor, that the issues in the complaint were in the NFA arbitration. But that's not the standard. But yes, it was. So let me just finish my point about equity. The privity has come to whether or not the interests were adequately protected for particular reasons. If you do not look at principal agent issue, one of the main cases, Supreme Court case, the Progressive Land Developers case, which is cited at length, I don't think anybody claimed that the reason res judicata was applied there is because the Illinois Attorney General is an agent of the Nation of Islam. And yet, that's what they said, that they adequately represented their interests. So you don't start from that. You look at whether or not they adequately represented those interests on the issue of privity. Now, that's a long introduction, I'm sorry, Your Honor, to the answer to your question about equity. But if I were to bring this claim against Mr. Haymar, then every time somebody brings a claim against a company to try to enforce, enforce oral representations outside, made outside of the written agreements, they can have a second right of the apple merely by claiming as a conclusion that when the executive, acting on behalf of the company, made those representations, he was acting outside the scope of his authority. I have a question about antithon. I'm sorry, Your Honor. Is that the case of antithon or antithon? Antithon, yes, Your Honor. Or however you pronounce it. Okay. So there was a large fraud there, right? And it was a motion for summary judgment. And the majority determined that because the conduct was a question of fact, that a motion for summary judgment wasn't appropriate. That's why they reversed it. Here we have a 2619. And the court granted the 269 motion. Do we need to look at that at all in terms of? I don't think there's a difference. I think that the issue of the 269 motion, cases can be dismissed for residue category. If it falls under it. I know that. And once you do that, you apply the law that we've quoted. What I mean is they decided that was the only case that they decided, right? And that case fell on the fact that the reason it went back to the trial court was because it was a question of fact, whether or not the conduct, similar to what Mr. Hamire did, was a question of fact. That's where I draw a distinction, Your Honor. Okay. I think President Breyer earlier said that what had happened before was there was a health plan. And the issue was not is the health plan liable or not liable because of the representations made by its CEO. After that case was over, there was a second case, and the people, the defendants there said, you can't come after us. We're covered by that decision because we were agents of theirs. Well, I can describe that to you, and we can't answer that here today. But if we have no question here that everything that was said in the arbitration about Penson and everything that was sought to be applied against Penson was said by Mr. Hamire, there's not a question of fact of whether Mr. Hamire was Penson or not. Mr. Hamire was the only one who was Penson. He signed the agreements that are attached to the complaints. Well, they're arguing that he acted outside his authority when they committed these acts, and therefore that's a different cause of action. No, no. They're saying he did. They have nothing. The only thing he points out in his argument today is that somehow the parents thought that they should do it differently. So they did it differently the next time. That's not acting outside of the scope of his authority as present CEO of Penson. In fact, the entire first case was that because of the fact that he was the present CEO, he would be bound. And this is my point on equity. If all you can say is, well, I didn't win my case on those oral representations against the company, he must have been acting outside the scope of his authority. I'll sue him personally. That's the equity here. This case has been fully tried. It's like a retrial. I mean, it seems to me that this scope of authority thing can actually be called like a blind alley or a red herring because if you say, well, if it's a scope of authority question, well, then under the law that's a factual question and you can't have a summary judgment or you can't have a dismissal under 2619. But that doesn't seem to really be the issue because the issue that was tried at the arbitration hearing is not whether this was outside of his authority or not, but the issue that was tried at the arbitration hearing was, was this said or was this not said? If that was what was tried and the arbitrator ruled in your favor, then it seems like if this complaint goes forward, it's just a retrial. It's just, was this said or was this not said? And that's already been decided. Not only is it the same act of transactions, it would be exactly the same evidence. They do have 100% overlap. And the fact of the matter is it is a bit of a red herring because scope of authority is tied to principle and agent. So this is not a principle and agent argument. The principle and agent was an applicant and they needed to figure out what was the scope of their authority. And there's another case they had about a broker. But there is no, this is not a question of fact. They have not created a question of fact in this authority as to whether or not the president and CEO of a company has the authority to bind the company on issues within his area. And this is an issue within his area. Clearing corp, cured clearing operations, payment of commissions, transfer of accounts. This isn't an issue that this complaint says Mr. Haymire went over to Mr. Greenberg's house and blew up his car. Well, was that the scope of his authority was assumed against Pinson. This is outlaws to Pinson claiming that they had damages out of their business dealings. Business dealings. The business dealings were conducted by Mr. Haymire on behalf of Pinson. That's not a principle, agent, scope of authority issue. So I actually think, Your Honor, it is a red herring. Okay. All right, so we've been a very active bench today and we've asked everyone a lot of questions. I'll say the same thing that I said to Mr. Arboroni. So we've drawn you out for a long time, so what I'm going to do now is I'm going to ask that you wrap up. Thank you, Your Honor. I think we've raised most of the issues. I'll try to be very quick because this is the point of view from Mr. Haymire's point. It is that there was a trial on these very issues that involved the very same things. The case law in Illinois on identity of cause of action looks at the action transactions. You look at the action transactions in the NFA arbitration and you look at them for what was presented to them, which is best shown in Alaron's version of its case, which it wrote, and you apply that next to the complaint, the action transactions are the same. The privity, that issue is basically, could you have brought this case in this complaint against Benson? Because that's the point. Can you bring this case against Benson? And the answer has nothing to do with that pleading that was filed, that the court ruled on. It has to do with what was before the propagation panel and what's in this complaint. Could you bring this complaint against Benson as to the second prong of the three tests? I think there's no way, when you look at what was before the panel and what is in this complaint. Second and final point on the privity, and that is that the test is can you adequately represent the interest? I think that has been, we've addressed that, we've discussed that. We don't think it can be any clearer on the equity issue. We believe that the reason for res judicata is to avoid multiplicity and repetitious suits that harass. And this would do nothing more than harass Mr. Haymire in exactly the same case that we've already tried and now our honor has lost. Thank you for your attention. Thank you, counsel. Mr. Aguirone. I want to really emphasize the point that evidence presented, we don't have the transcript here. Everybody's making representations about evidence presented at the hearing. Evidence presented at the hearing is meaningless. Res judicata fortunately determines on issues, and we know what issues were presented and what issues weren't. I want to address the issue of equity that was brought up. The one thing, and let's get an idea, as we've said in our complaint, where we were at this time is before Mr. Haymire's organization. The one thing we know that was at issue, that nobody's going to say was not at issue, was the validity of the non-clearing FCM agreement. Look at page 19 of our brief, and you tell me how any fair judicial or arbitrated body who is not trying to protect the executive vice president against allegations would strike issue number seven. How could that possibly not be an issue in a contract? Our defense is we were fraudulently introduced. The counsel has argued that he's not going to stand here and say every single one of these was actually decided, but that your hearing plan indicates that many of these were decided. And I don't think there's any question that your counterclaim suggests that Penson fraudulently induced the alibi. I'm not saying it doesn't, Your Honor. What my hearing plan says is meaningless. Right, but Haymire's testimony at the arbitration hearing would clearly indicate that. No, it does. If it was litigated. It can't be litigated. How come when a panel says, you know, I'm sitting here with a panel that an arbitration says, we're not going to get these issues yet. Now suddenly we're going to take their order and say they didn't really mean what they said. They list our claims. Look in our claims anywhere where the Miami office on page, they list the claims. Exhibit 2 lists our claims that the panel heard. I think it's Exhibit 2. It's the arbitration award. And it's right there and it lists what our claims were. And it doesn't mention Miami. It doesn't mention any of these. So if the claims aren't there and they've already struck the issues, I don't care what was presented at the hearing or what wasn't presented at the hearing, it couldn't have been decided by them. The $600,000 at 18, whether it's in our hearing plan right now, look at number 18. They struck that. Gene Likett is number one or number three. Does it make sense for them to strike things that are already in the hearing plan? No, no. They struck. They already struck these. Okay? They said these issues are not going to be heard. And you can look at the award. They weren't heard. All right? So what we have to do, and you can look at the non-clearing FCM agreement. TD Ameritrade isn't mentioned in there. That's a whole different thing. The Miami office isn't mentioned in there. So we can talk all about the non-clearing FCM agreement. None of them are there. As to the issue of privity, if the defense had been different, yes. But just because they say he never said it, how many times in anybody's career do you get somebody who commits a fraud on the stand that said, yeah, I lied? So what happened here? Haymeier said, I didn't lie. And the company says, our man didn't lie. What are they going to say? He lied? I mean, they're not going to say it because they weren't there. And I would point to the fact as to whether he controls the corporation to our allegation, since we want to look at the hearing plan, is to tab two of the supplemental record on appeal, where we say in our hearing plan that Haymeier told us it was Gilmore refused to, if we look at page 31 and read that first sentence, Haymeier's telling us it's Gilmore that's running the company, not him. And we're entitled also to prove that. All you have to do is look at the second full sentence in the second paragraph on page 31. Second of all, the NFA rules, as we note on page five, one of our reply briefs called the panel, it's the hearing plan. You enforce the hearing plan, you follow the hearing plan. So how can anybody here who wasn't there sit and say that these things were decided? How can somebody who tells me somebody else in my corporation, according to what we said in the hearing plan, said you can't do these things, how can they be in control of a subsidiary or of any corporation? And that's stated right then and there. But these issues, and they said we're not going to let your claim for interpersonal interference with prospective business relationships go on. And this is what happens all the time. We have to take them by their word. The judge says I'm not going to hear these issues regardless if you, for some reason, and you know in arbitration they let you go on and on. If somebody puts evidence on, what difference does it make if the issue wasn't before them? And if the issue was before them and they did decide it, why did they limit us to the claims that are stated in the arbitration award, none of which mention any of these issues that they precluded? And if it's equitable, why? It's a big deal. Everybody's now saying before, of course, Henson and everybody's saying, these have no relationship to what's before the panel. Don't let him amend the complaint. Don't let him do it. Now all of a sudden, oh, they're closely related. Why couldn't we amend it then? It was eight months before the hearing. Why couldn't we submit it? What's the big deal? The big deal is we were playing in Haymire's house. That's the big deal. And that's why we would never sue him back there and we'd never bring another claim against Henson. Well, couldn't you say that same thing about Henson? Yes, but we had no case. We had a contract. You did counterclaim against Henson. It's mandatory arbitration. If we would have come to court, they'd come in with the agreement that says we had to go there. We don't have to go there for Mr. Haymire. Unless you have more questions on it. Thank you, counsel. Thank you. Thank you. Thank you for your time. Our compliments to counsel for each party with regard to the briefing and the arguments today. And we will take this matter under advisement. Court is adjourned. Thank you.